**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **SIERRA CLUB** and **PRAIRIE RIVERS NETWORK**, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 25-cv-2202 |
| v. | ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **TENNESSEE VALLEY AUTHORITY, DON MOUL,** in his official capacity as President and Chief Executive Officer of the Tennessee Valley Authority, and **BRYAN WILLIAMS,** in his official capacity as Senior Vice President of the Tennessee Valley Authority, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## INTRODUCTION

1. Sugar Camp Energy, LLC ("Sugar Camp Energy") operates a coal mine (the "Sugar Camp Mine") under a lease of mineral rights from the Tennessee Valley Authority's ("TVA") 65,000-acre holdings centered in Franklin County. Operators at Sugar Camp Mine have caused miners' deaths, violated environmental laws and permits, injected toxic waste into the ground to try to put out the underground fires they have caused, and wreaked havoc on local property owners and recreators. Because of the Sugar Camp Mine, polluted, polyfluoroalkyl substances ("PFAS")-laced water bubbles into people's yards, their trees die, the market values of their homes sink like the very land beneath them, local drinking water sources are threatened, and massive amounts of greenhouse gases are released. Mining discharges degrade the watershed of the Big Muddy River, a tributary of the Mississippi River that runs through southern Illinois and some of the

state's most treasured natural landscapes, leading hikers and canoers to wonder whether they can still safely enjoy the region as they have for decades.

2. And yet, TVA recently authorized an expansion of the Sugar Camp Mine under the existing lease between Sugar Camp Energy and TVA (the "Lease"), and TVA plans to sell off the entirety of its regional mineral rights to allow a private company to expand the mining and burning of coal. TVA's actions are based on a misreading of the Lease and an improperly conducted environmental review, and, therefore, violate the Administrative Policy Act ("APA") requirement that agency actions cannot be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. The same misreading of the Lease caused TVA to artificially constrain its already flawed analysis of environmental impacts under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331 *et seq.*, and violate NEPA's directive to "study, develop, and describe technically and economically feasible alternatives." 42 U.S.C. § 4332(F).

3. In its stated policies and NEPA documents, TVA has decided wisely that mining and burning coal is extremely harmful to human health and the environment. But TVA also decided that, in spite of these harms, it would approve further mining in southern Illinois and sell its coal interests to another entity so that such coal can be burned, causing precisely the type of massive damage to the environment that TVA claims it seeks to prevent and will stop causing through its own operations.

4. Because TVA's actions were based on both legal errors and untenable factual assumptions, and flout its statutory duties and mission to safeguard public resources, plaintiffs Sierra Club and Prairie Rivers Network ("PRN"), which each have members that will be directly impacted by the mining, respectfully ask this Court to vacate TVA's approval of expanded mining and require

TVA to meaningfully consider the repercussions of both mining expansion and mineral rights divestment under a proper interpretation of its legal rights and responsibilities and for the relief described below.

## JURISDICTION & VENUE

5. This Court has jurisdiction over this action because defendant TVA is a federal agency and because this action raises federal questions, pursuant to 28 U.S.C. § 1331, in that plaintiffs' claims arise under federal statutes, the National Environmental Policy Act, 42 U.S.C. § 4331 *et seq.*, and the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.*

6. The Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202 and its inherent authority. Injunctive relief is also authorized by 5 U.S.C. § 706.

7. Venue in the Southern District of Illinois is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to this action occurred in this district and the TVA-owned mineral rights at issue are located within this district.

## PARTIES

**Plaintiffs**

8. Plaintiff Sierra Club is America's largest grassroots environmental organization, with more than two million members and supporters nationwide. In addition to creating opportunities for people of all ages, levels and locations to have meaningful outdoor experiences, Sierra Club works to safeguard the health of our communities, protect wildlife, and preserve our remaining wild places through grassroots activism, public education, lobbying, and litigation. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and

to using all lawful means to carry out these objectives. Sierra Club has an Illinois Chapter that includes a Shawnee Group that focuses on protecting resources in southern Illinois. Sierra Club's concerns encompass the exploration, enjoyment, and protection of the land, water, and air of Illinois. Sierra Club also has a long history of fighting against the worst impacts of climate change to achieve a safe and stable future for all. Sierra Club's Beyond Coal campaign, which advocates for an electric power system run on affordable, reliable clean energy, is one of the most extensive, effective, and long-lasting campaigns in the history of the environmental movement.

9. Plaintiff Prairie Rivers Network is an Illinois not-for-profit organization with more than 1,000 members that champions clean, healthy rivers and lakes and safe drinking water to benefit the people and wildlife of Illinois. Drawing upon sound science and working cooperatively with others, PRN advocates for public policies and cultural values that sustain the ecological health and biological diversity of water resources and aquatic ecosystems. PRN is also committed to fighting against the growing climate crisis, which is caused primarily by the emission of greenhouse gases, and which is already having substantial adverse impacts throughout the state of Illinois. PRN supports efforts to adapt to and mitigate the impacts of climate change by promoting regenerative agriculture, protecting vulnerable ecosystems, and advocating for a just and equitable transition to renewable energy.

10. Members of both organizations live, work, and recreate near the Sugar Camp Mine, including members who live immediately above active mining operations. Members also recreate on and around the Big Muddy River, a river that is directly impacted by discharges from the Sugar Camp Mine, both at the precise point where the Sugar Camp Mine discharges pollution, and downstream as that same water pollution flows down the river. Members of both

organizations have been directly and adversely impacted by mining activity near their homes and places of recreation. These members will suffer continued and worsened adverse impacts in the same ways if the mining operations expand and if TVA proceeds to divest itself of its coal reserves in southern Illinois.

11. Sierra Club and PRN bring this action on their own behalf and on behalf of their adversely affected members.

12. Mining activities at Sugar Camp Mine, authorized by TVA's approvals and under the Lease described below, have caused direct adverse impacts to the property of several PRN members. For example:

    a.  Sugar Camp Mine has caused substantial subsidence on the land of at least two members following mining near and below their properties. One such member's house formerly sat on top of a small hill on her property. Today, the land lays almost completely flat.

    b.  In 2021, there was a fire in the Sugar Camp Mine. Sugar Camp Energy used foam containing PFAS in attempts to put out that subterranean fire. This foam leaked out of the mine, as described in greater detail below. Following this fire, several members have had standing water on their property tested and been informed that it is contaminated with PFAS. PFAS has been associated with numerous adverse health consequences and expanded mining operations threaten to increase member exposure to these harmful chemicals.

    c.  Since Sugar Camp Energy used PFAS in the mine below her home in 2021, one PRN member has had several trees on her property die. This has reduced the aesthetic appeal of her land and deprived her of the numerous benefits that trees provide. That

5

same member used to maintain a garden but no longer feels that she can safely dig in the soil on her property to plant vegetables due to contamination from mining activities. Already unable to use her property as she would like, this member is worried about how TVA's decision to approve expanded mining operations will further reduce her enjoyment of her land and home.

d.  Another person, who is a member of both PRN and Sierra Club, jointly owns property that is regularly flooded by the Big Muddy River downstream of the Sugar Camp Mine. She and her partner are concerned about the increased adverse impacts this flooding could have when the waters of the Big Muddy are contaminated with discharges from the expanded mining operations approved by TVA. Due to worries about property damage from flooding and exposure to contaminated water, the pair have had to purchase pumps to draw out water from their property.

e.  Yet another PRN member regularly visits his mother at his childhood home in Franklin County, a home located roughly ten miles east of the current Sugar Camp Mine and just south of Rend Lake. During these visits, he is disturbed by a foul smell and a constant, irritating noise coming from a pump station that he understands Sugar Camp Energy installed just across the street from his mother's home, along the north side of Petroff Road in Benton. He believes that the pump station is connected to piping laid by Sugar Camp Energy and that it is being used to transport contaminated water from the Sugar Camp Mine to the Big Muddy, just south of the Rend Lake Dam. He is concerned about contamination from this pipe and pump station harming his mother and her property, particularly because the area experiences regular flooding with water that he worries may be contaminated. Further, his mother keeps animals on her property that

drink from pumps that draw groundwater, which he worries may be contaminated by Sugar Camp Mine activities. He will eventually inherit this property from his mother, and he is concerned about how continued Sugar Camp Mine mining and discharges will impact his inheritance.

f.  The 2016 Public Notice of a Sugar Camp Energy Clean Water Act permit, No. IL007856 (the "Permit") includes a map of Franklin County overlaid with the location of permitted Outfall 017, which is located just next to the Big Muddy and south of Rend Lake Dam. Upon information and belief, the pipe described in the preceding subparagraph, that runs by the PRN member's mother's home and along Petroff Road discharges pollutants at Outfall 017 into or next to the Big Muddy.

g.  All of the above impacts diminish or threaten to diminish the property values of members' homes. As TVA continues to approve expanded mining operations, these impacts worsen, further devaluing the homes and land of members. At least two PRN members are trying to move away from the area near the Sugar Camp Mine. They are worried about their ability to get a fair price for their homes due to these adverse property impacts. They would not be trying to move if not for the impacts of mining approved by TVA.

13. Members of both organizations have concerns about impacts on their health from the increased mining activity that TVA has authorized. For example:

a.  Members are worried about adverse impacts to their drinking water. Sugar Camp Energy's use of PFAS has contaminated water sources on and near the property of members. Sugar Camp Mine also regularly discharges other pollutants into nearby water sources under the Permit, further degrading water quality. Some members draw their

drinking water from Rend Lake, which is near the mining site, and which receives water from the Big Muddy. Members are concerned that Rend Lake is already contaminated due to mining discharges and worry that further mining will worsen water quality and lead to adverse health consequences.

b. One PRN member suffered particularly severe impacts from PFAS contamination coming from the Sugar Camp Mine. Shortly after the fire in the portion of the Sugar Camp Mine near her home, the member's dog drank from a creek on her property. The dog, a longtime companion and treasured family member, became severely sick after this incident. Over the course of several weeks following its exposure to the creek, the dog began to grow tumors all over its body, some of them the size of baseballs. Tragically, the dog died a month after drinking from the creek, which the Illinois Environmental Protection Agency ("IEPA") confirmed was contaminated with PFAS. She believes that the chemicals in the water caused her dog's death. Since learning that the creek on her property was contaminated, the member has kept her horse confined to a small parcel of her land to keep it from being exposed to contaminated water. This has meant that her horse is unable to sustain itself by grazing on her property. Because of this, she has had to buy hay and supplements to keep her horse fed and healthy, more than doubling her month-to-month feeding costs. As long as mining continues near her property, which would be prolonged by TVA's authorization of additional mining activities and proposed divestment, she will continue to face these costs, as well as the associated anxiety about the well-being of herself and her horse.

c. Another PRN member has been dealing with the effects of Sugar Camp Mine discharges on her property for years. Following the 2021 Sugar Camp Mine fire, she

began to notice a foul sludge bubbling up through the ground all over her property, which has active mining operations beneath it. Sugar Camp Energy eventually sent a worker to attempt to divert some of this sludge. He dug trenches and laid pipes on portions of the member's land, causing some of the sludge to drain off of her property towards a creek, which feeds into Rend Lake. The member learned that shortly after the worker visited her property, he was diagnosed with cancer and died only a few months later. She believes that his cancer diagnosis and ultimate death were a direct result of his exposure to the sludge. To this day, the sludge continues to bubble up through the ground on certain parts of the member's property, with a portion of the sludge continuing to drain in the direction of the creek on the edge of her property. She is now afraid to use her property as she used to due to worries that she too will get cancer. Further, she is worried about the impact the diverted sludge might be having when it reaches Rend Lake from the creek on her property. Rend Lake is a local public drinking water source for this member and others in her community.

    d.  Members of both organizations have serious concerns about the increased air pollution that will come from TVA's approved expansion of mining operations. Coal mining and burning emit high amounts of pollutants into the ambient air, particularly in the vicinity of the mines themselves. One PRN member was especially worried about her asthma symptoms being exacerbated by mining.

14. Members of both organizations have recreational interests that would be adversely impacted by the expanded mining operations TVA has approved. For example:

    a.  Members canoe and kayak on the Big Muddy, but are worried that they may have to stop doing so as increased mining discharges may make the water unsafe.

b. Members hike along the banks of the Big Muddy and on nearby trails throughout the Big Muddy watershed but are worried that continuing to do so may expose them or their children to contaminants from expanded mining activities. Fear of exposure to contaminants interferes with their recreation: one member's wife admonishes their grandchildren to keep heads above the water when swimming in the region. Hiking in the Big Muddy region often involves crossing streams fed by the Big Muddy and exposes members to physical contact with contaminated water.

c. Members duck-hunted in trails near the Big Muddy for decades, including areas like Crab Orchard and Oakwood Bottoms. One of these members constructed nesting boxes throughout Oakwood Bottoms to grow the local duck population.

d. Members of both organizations enjoy watching wildlife, such as migratory birds, in and along the Big Muddy and are worried about the impacts that increased mining activity will have on vulnerable species that call these areas home.

e. One PRN member was accustomed to seeing numerous hummingbirds on her property every summer and got significant enjoyment out of watching them. However, as mining has increased near her property, she has seen fewer hummingbirds each year. She worries that soon she will not be able to enjoy watching hummingbirds on her property at all, as the area becomes less hospitable to them because of increased mining.

**Defendants**

15. Defendant TVA is a federal agency and public corporation created by the TVA Act of 1933, 16 U.S.C. § 831 *et seq*. Under its organic act, TVA is charged with generating and distributing electricity across the Tennessee Valley, encouraging economic development, and

stewarding the environment. 16 U.S.C. §§ 831a; 831v. TVA "[m]ay sue or be sued in its

corporate name." 16 U.S.C. § 831c(b).

16. As a federal agency, TVA is subject to the requirements of both NEPA and the APA.

42 U.S.C. § 4331 *et seq*; 5 U.S.C. § 701 *et seq*.

17. Defendant Don Moul is the President and Chief Executive Officer of TVA and is sued in

his official capacity. As the President and Chief Executive Officer, Moul is responsible for

ensuring that TVA complies with all applicable laws.

18. Defendant Bryan Williams is a Senior Vice President at TVA and is sued in his official

capacity. Williams signed the Record of Decision announcing TVA's approval of the challenged

mining expansion and described further below.

## FACTUAL BACKGROUND

**TVA Acquires Coal Reserves in Southern Illinois**

19. Beginning in the mid-1960s, TVA began to acquire the mineral rights to coal reserves

underlying 65,000 acres of land in three Southern Illinois counties—Jefferson County, Hamilton

County, and Franklin County (the "TVA Mineral Rights Area").

20. The land overlying TVA's mineral rights is predominantly used for agricultural purposes.

Over 40,000 acres of that land are designated as either prime farmland or farmland of statewide

importance. Almost 50,000 acres of the land are currently used for either cultivating crops or as

pasturage. Thousands of people live atop or adjacent to TVA's coal reserves. Per the most recent

census, just over 80,000 people live in the three counties where the coal reserves are located and

11,525 of those people live in census tracts that either intersect or are entirely encompassed by

TVA's holdings.

21. The coal reserves also underlie a multitude of natural resources. There are 22 different named streams or rivers that cross over the mineral rights area along with hundreds of acres of ponds, lakes, and wetlands situated above the coal reserves. Furthermore, the majority of a 5,280-acre state Fish and Wildlife Area—Ten Mile Creek—is located within the lands encompassed by the coal reserve. The coal reserve area provides essential habitat for many animal species, including at least five threatened or endangered species.

**TVA Leases Its Coal Reserves to the Illinois Fuel Company**

22. In 2002, TVA signed a lease (the "2002 Lease") with the Illinois Fuel Company granting the lessee the right to mine coal reserves underlying a 58,235-acre tract of land, identified in the lease as "TVA Tract No. XENC-3L." Under the terms of the 2002 Lease, TVA would receive royalties from the Illinois Fuel Company to be calculated based upon the tons of coal mined and removed from the leased coal deposits.

23. The terms of the 2002 Lease permit TVA to "direct activities for the protection of the environment . . . in excess of those required by law provided TVA bears the cost of such activities" and to "prohibit mining on a portion of, or all of, the leasehold," provided that TVA may have to return some prior payments made under the lease.

24. The terms of the 2002 Lease also require the lessee to refrain from "any mining activity pursuant to a mining plan or revisions thereto until satisfactory completion of all environmental and cultural resource reviews by TVA," and to conduct all mining under the lease "in such a manner so as to (a) comply with all applicable local, state, and federal laws and regulations and (b) protect the environment."

25. The 2002 Lease grants TVA the right to terminate the lease if the lessee "fails to comply with any of the provisions" of the lease, provided that TVA gives the lessee written notice and 30 days to correct any noncompliance.

**The Original Lessee Assigns the Lease to Ruger Coal Company and Sugar Camp Energy Commences Mining**

26. In 2009, with TVA's written consent, the Illinois Fuel Company entered into an agreement with Ruger Coal Company to assign all of Illinois Fuel Company's estate, rights, title, and interests under the 2002 Lease to Ruger Coal Company (the "2009 Assignment Agreement"). In that same agreement, Ruger Coal Company obtained TVA's consent to have one of its affiliates, Sugar Camp Energy, actually mine the coal reserves covered by the lease.

27. In 2008, before the 2009 Assignment Agreement was executed, Sugar Camp Energy obtained an underground coal mining permit from the Illinois Department of Natural Resources that permitted Sugar Camp Energy to begin longwall mining operations on an approximately 12,000-acre tract of land. In 2017, the boundaries of the underground coal mining permit were revised to encompass an additional 37,972-acre tract. In 2024, the boundaries of the underground coal mining permit were conditionally revised to encompass an additional 22,414-acre tract of land.

28. Between 2011 and 2020, Sugar Camp Energy submitted five different requests to TVA to expand its mining operations into mineral rights owned by TVA and leased to Ruger Coal Company under the terms of the 2002 Lease and the 2009 Assignment Agreement. For each of the five requests, TVA conducted an environmental review and then authorized Sugar Camp Energy's requested expansions. During that period, TVA approved Sugar Camp Energy to mine over 18,000 acres of the coal reserves that TVA owns.

**Sugar Camp Energy's Mining Operations Violate Environmental Laws**

29. Shortly after it began operating in the TVA Mineral Rights Area, operators at Sugar Camp Mine began violating environmental and workplace safety laws.

30. Since 2014, IEPA has found that operations at Sugar Camp Mine violated environmental laws six different times.

31. In 2013, the U.S. Mine Safety and Health Administration ("MSHA") found that a Sugar Camp Mine "operator did not have effective policies, programs, procedures, or controls" to protect miners after a miner was killed in the Sugar Camp Mine.

32. In 2014, MSHA found that a Sugar Camp Mine "operator did not have effective policies, programs, procedures, or controls in place to protect miners" after another miner was killed in the Sugar Camp Mine.

33. In 2014, IEPA issued a Violation Notice to Sugar Camp Energy for constructing underground injection wells without a permit.

34. In 2015, MSHA found that a Sugar Camp Mine operator failed to properly train miners and failed to use proper equipment, after yet another miner was killed in the Sugar Camp Mine.

35. In 2016, IEPA renewed the Permit, which covers alkaline mine drainage discharges into waterways from the Sugar Camp Mine. Subject to the limits and conditions of the Permit, Sugar Camp Energy is authorized to discharge alkaline mining pollutants into an unnamed tributary of the Middle Fork of the Big Muddy River ("Big Muddy River Tributary") and surrounding creeks.

36. In 2018, TVA itself alleged that Sugar Camp Energy was performing mining operations in violation of the Lease and in contravention of environmental review requirements. TVA sued

Sugar Camp Energy in the Eastern District of Tennessee, Case No. 3:18-cv-239, and sought an injunction prohibiting Sugar Camp Energy from further unauthorized mining.

37. In 2019, IEPA issued a Violation Notice to Sugar Camp Energy for a leaking underground pipeline that discharged high chloride mine pumpage water into the environment.

38. In 2021, there was an underground fire at Sugar Camp Mine.

39. Sugar Camp Energy injected PFAS-laden firefighting foam into the mine as part of its efforts to control the 2021 fire.

40. According to a U.S. Department of Justice press release, a former Sugar Camp Energy official entered an August 2025 guilty plea to "conspiring to defraud the U.S. Mine Safety and Health Administration" in relation to Sugar Camp Energy's response to this fire. When the fire was ignited, rather than evacuating the mine immediately, the official "and conspirators agreed that they would not evacuate miners or notify" MSHA.

41. In 2021, IEPA issued a Violation Notice to Sugar Camp Energy for the unpermitted release of PFAS contaminated wastewater into nearby surface waters.

42. Those nearby surface waters included the Big Muddy. According to a complaint brought by the Illinois Attorney General in the Circuit Court of Franklin County, No. 2022-CH-2, Sugar Camp Energy in 2021 "conducted sampling for PFAS in water samples taken from Outfall 001 [an outfall that discharges mine drainage] and the Big Muddy River Tributary approximately 100 feet downstream from Outfall 001." The samples contained PFAS contamination.

43. Plaintiffs Sierra Club and PRN are pursuing a Clean Water Act citizen suit claim against Sugar Camp Energy for its release of PFAS in the same case, No. 2022-CH-2.

44. In 2022, IEPA issued a Violation Notice to Sugar Camp Energy for the unpermitted discharge of mine wastewater into surface waters from a fan bleeder shaft.

15

45. Also in 2022, IEPA issued a Violation Notice to Sugar Camp Energy for land subsidence causing high-chloride water seeps.

46. Finally, also in 2022, IEPA issued a Violation Notice to Sugar Camp Energy for the unpermitted construction of water evaporators.

47. As of the time that the Final EIS was published, several of these IEPA-initiated enforcement actions were unresolved.

48. Sugar Camp Energy's violations harm Sierra Club and PRN members, as described above in paragraphs 12-14. Increased PFAS pollution and other unauthorized discharges financially harm and physically threaten local property owners: property values diminish, and residents come into contact with harmful substances. Further, these unauthorized discharges make the Big Muddy and its watershed less safe for recreators.

49. In addition to harm from Sugar Camp Energy's illegal discharges, Sierra Club and PRN members will be harmed by expansions to the Sugar Camp Mine even if such expansions do not exhibit the same persistent pattern of environmental law violations. According to TVA's Final EIS, "[r]evisions to the [NPDES] permit would be necessary for additional surface water discharge outfall locations . . . associated with all Sugar Camp Mine No. 1 construction projects." Such changes to and potential expansions of permitted pollution discharges will also harm the interests of Sierra Club and PRN and their members.

**TVA Commitments to Reducing Carbon Emissions**

50. In 2011, TVA published a "Statement on Climate Change Adaptation" to incorporate climate change adaptation planning into its existing processes, acknowledging that climate change caused by greenhouse gas emissions may pose risks to TVA's mission and operations. In the statement, TVA announced that it would study how climate change could impact TVA's

16

mission, assess the potential consequences of climate change and "[d]evelop, prioritize, implement and evaluate adaption planning actions . . . to moderate climate change risks."[1]

51. Just a year after publishing its Statement on Climate Change Adaptation, TVA published its "Climate Change Adaptation Action Plan." TVA's stated goal in engaging in the adaptation planning process is to "manage[] the effects of climate change on its mission, programs, and operations within its environmental management processes," including a greenhouse gas objective to "stop the growth of emissions and reduce the rate of carbon emissions."[2]

52. In more recent years, TVA has announced its plans to reduce its carbon emissions over time. In 2019, TVA issued a final Integrated Resource Plan ("IRP") to "shape how TVA will provide low-cost, reliable and clean electricity." Furthermore, in a 2021 report titled "TVA Strategic Intent and Guiding Principles," TVA announced that it was "[e]xecuting a plan to 70% carbon reduction by 2030."

53. Also in 2021, TVA adopted an Environmental Policy stating that TVA was committed to "reducing carbon intensity and air emissions" and to "[i]ntegrat[ing] environmental considerations and science-based decision making into strategy, design, construction, and operational activities to mitigate environmental impacts."[3]

---

[1] TENNESSEE VALLEY AUTHORITY, *TVA Statement on Climate Change Adaptation* (Jun. 1, 2011), https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/default-document-library/about-tva/guidelines-reports/climate-statements-plans/2011-climate-statements.pdf?sfvrsn=da11a0f9_2.
[2] TENNESSEE VALLEY AUTHORITY, CLIMATE CHANGE ADAPTATION ACTION PLAN (2012), https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/default-document-library/about-tva/guidelines-reports/climate-statements-plans/2012-climate-plan.pdf?sfvrsn=7c9c255e_2.
[3] TENNESSEE VALLEY AUTHORITY, *TVA Environmental Policy* (May 7, 2020), https://tva-azr-eastus-cdn-ep-tvawcm-prd.azureedge.net/cdn-tvawcma/docs/default-source/environment/environmental-stewardship/environmental-policy-5-7-2020.pdf?sfvrsn=ee4bdc08_2.

**Sugar Camp Energy Requests Authorization to Expand Its Mining Operations**

54. In June 2023, Sugar Camp Energy requested that TVA authorize Sugar Camp Energy to expand its mining operations within the TVA Mineral Rights Area so that it could mine an additional 21,868 acres of coal reserves.

55. After receiving Sugar Camp Energy's request, TVA began an environmental review process as required by NEPA. In October 2023, TVA published a Scoping Report in which TVA announced that it was considering both whether to authorize the mining expansion and whether to divest its Southern Illinois coal reserves in their entirety.

56. In August 2024, TVA released a Draft Environmental Impact Statement ("Draft EIS") analyzing the environmental effects of both authorizing Sugar Camp Energy to expand its mine and divesting TVA's Southern Illinois coal reserves. The four alternatives identified in the Draft Environmental Impact Statement were: (1) No-Action Alternative under which TVA would neither authorize the mining expansion nor divest; (2) Action Alternative A under which TVA would authorize the mining expansion, but would not divest; (3) Action Alternative B under which TVA would both authorize the mining expansion and divest; and (4) Action Alternative C under which TVA would not authorize the mining expansion, but would divest.

57. In the Draft EIS, TVA stated that it had no preferred alternative at that time.

58. In the Draft EIS, TVA stated that the primary purpose of authorizing the mining expansion was to "recoup the investment that TVA has already made and comply with the terms and conditions of the previously executed leases and agreements regarding the TVA Mineral Rights Area."

59. In the Draft EIS, TVA stated that the longwall mining proposed under Alternatives A and B, and any divestment scenario that entails longwall mining, would result in more than 16,000

acres of subsidence of surface lands, 94% of which is designated as "prime farmland" or "farmland of statewide importance." TVA did not expect that the small amount of room and pillar mining would cause surface subsidence above the mine.

60. In the Draft EIS, TVA stated that the primary purpose of divesting was for "TVA to recover economic value from the initial expenditure."

61. Both while preparing the Scoping Report and following publication of the Draft EIS, TVA received comments from the public on its environmental review process, which raised a number of concerns.

62. Commenters, including Plaintiffs Sierra Club and PRN, urged TVA to take all feasible steps to cease coal mining from the TVA Mineral Rights Area. These commenters asserted that both the approval of the mining expansion and the decision to divest would contribute to climate change and other environmental harms because both decisions would lead to more coal being mined and burned.

63. Commenters, including Plaintiffs Sierra Club and PRN, also raised Sugar Camp Energy's history of environmental law violations and expressed concern for how the approval of the mining expansion and divestment would impact water quality.

64. Commenters, including Plaintiff Sierra Club, also encouraged TVA to consider the impact of cumulative subsidence due to mining activity on farmland and local landowners.

65. For those reasons, commenters urged TVA to choose the No-Action Alternative.

66. In January 2025, TVA released a Final Environmental Impact Statement ("Final EIS"). The Final EIS analyzed the same four alternatives as the Draft EIS, but the Final EIS indicated that the agency had selected a preferred alternative—Alternative B wherein TVA would both authorize the mining expansion and divest its ownership interests in the coal reserves.

67. In the Final EIS, TVA explained that the primary purpose behind the divestment decision had changed from "recover[ing] economic value from the initial expenditure" to "align[ing] real property interests in TVA's custody and control with future TVA mission needs."

68. In explaining how divestment would help it to align its real property interests with its future mission needs, TVA cited to a 2025 version of its IRP, which anticipates retirement of remaining coal-fired generating facilities by 2035, and TVA's aspirational goal of achieving net-zero carbon emissions by 2050. TVA also noted that it no longer purchases coal mined from the TVA Mineral Rights Area. TVA ultimately conclude that "[d]ivestment . . . would align with TVA's goals of being low-cost, risk-informed, environmentally responsible, reliable, diverse, and flexible, as identified in the 2019 IRP and supported by the 2025 IRP."

69. TVA also explained its reasoning behind approving the lease expansion, writing:

> During the Draft EIS public comment period, TVA received multiple comments that this EIS should include an alternative that would ensure the entire 680 million tons of TVA-owned coal remains in the ground (Appendix B). TVA considered such an alternative but determined that, while it would result in reduced environmental impacts, it was not reasonable due to the existing, enforceable lease.

70. Also in the Final EIS, TVA acknowledged that its preferred alternative, "Alternative B[,] is not in alignment with interim GHG reduction and climate action goals," but wrote:

> However, almost 50 percent of the total coal mined under Alternative B would be mined by the end of 2050 under a new owner. Under TVA's mineral rights divestiture, the remaining 50+ percent could also be mined by a new owner who would take on the responsibility of meeting GHG reduction and climate action goals and associated social costs of GHG emissions.

71. The Final EIS does not explain how or why a private entity that purchases the mineral rights that TVA divests would be responsible for "meeting GHG reduction and climate action goals," that are TVA's policies.

72. On March 27, 2025, TVA published a Record of Decision in the Federal Register announcing that it had decided to authorize Sugar Camp Energy's mine expansion to allow an additional 21,868-acre tract to be mined for coal. The reason that TVA gave for its decision was the need to "adhere to the executed lease agreements to comply with the terms and conditions of the previously executed leases and agreements regarding the TVA Mineral Rights Area."[4]

73. The 2002 Lease requires Sugar Camp Energy to conduct all mining "in such a manner so as to (a) comply with all applicable local, state, and federal laws and regulations and (b) protect the environment."

74. Sugar Camp Energy's myriad environmental law violations described above demonstrate a repeated inability or unwillingness to comply with the law.

75. The 2002 Lease also grants TVA the right to terminate the lease if the lessee "fails to comply with any of the provisions" of the Lease.

76. TVA's Final EIS and Record of Decision did not consider how Sugar Camp Energy's violations of environmental laws impact TVA's obligations under the Lease with respect to considering requests for mining expansions.

77. The March 27, 2025, Record of Decision explained that "TVA will consider divestiture of the property in a separate ROD, likely later in 2025, through subsequent consideration and action by the TVA Board of Directors."

78. If TVA decides to divest, that decision would be a major federal action subject to the requirements of NEPA.

79. The January 2025 Final EIS explicitly purported to consider the divestment decision as part of its analysis of alternatives.

---

[4] Sugar Camp Energy, LLC Mine No. 1 Significant Boundary Revision 8 Environmental Impact Statement, 90 Fed. Reg. 13974, 13975 (Mar. 27, 2025), https://www.govinfo.gov/content/pkg/FR-2025-03-27/pdf/2025-05270.pdf.

80. Under the Final EIS's preferred alternative, Alternative B, TVA would both authorize the mining expansion and divest its ownership interests in the coal reserves.

81. The March 27, 2025, Record of Decision did not include any reference to further NEPA review of divestment beyond the Final EIS.

82. TVA is governed by the TVA Act, 16 U.S.C. §§ 831 *et seq.*, which controls TVA's real property divestment process, and requires the sale of surplus assets, including mineral rights, where there are no "plans and projects actually decided" for the real property interest.

83. Further, under that section, when TVA divests, the property "shall be sold by the Authority . . . after due advertisement, at public auction to the highest bidder."

84. As of the date of filing this complaint, TVA has not published a separate Record of Decision regarding divestment in the Federal Register. Should TVA issue such a Record of Decision, TVA could seek to begin the divestment process immediately based on the NEPA process that TVA views as completed. In that event, Plaintiffs intend to seek leave to amend their pleadings to allege appropriate additional facts or claims.

## CLAIMS FOR RELIEF

**Count I: Defendants' Decision to Authorize the Mine Expansion Violated the APA Because It Was Predicated Upon a Legal Error.**

85. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

86. Defendants are subject to the APA. 5 U.S.C. § 701. Defendants' decision to authorize the mine expansion is final agency action subject to judicial review. 5 U.S.C. § 704.

87. The APA requires a court reviewing a final agency action to "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

88. Defendants stated that TVA chose to authorize the mine expansion because it considered such authorization necessary to "adhere to the executed lease agreements to comply with the terms and conditions of the previously executed leases and agreements regarding the TVA Mineral Rights Area."

89. Upon information and belief, the "terms and conditions" to which Defendants refer is a provision in the 2002 Lease that states TVA's approval of a proposed mining plan or proposed revision thereto "shall not be unreasonably withheld."

90. However, the 2002 Lease allows TVA to "direct activities for the protection of the environment . . . in excess of those required by law provided TVA bears the cost of such activities" and to "prohibit mining on a portion of, or all of, the leasehold," provided that TVA may have to return some prior payments made under the lease.

91. Indeed, in a 2018 complaint, TVA itself alleged that the 2002 Lease empowers TVA to "'prohibit mining on a portion of, or all of, the leasehold' based on the results of its environmental and cultural resource reviews."

92. Under the terms and conditions of the previously executed lease regarding the TVA Mineral Rights Area, TVA could have refused to authorize the mine expansion.

93. TVA committed a legal error in asserting that it was required to authorize the mining expansion because it had the right under the 2002 Lease to refuse its authorization and pay for the costs of any such decision.

94. Further, the 2002 Lease requires the lessee, Sugar Camp Energy, to conduct all mining "in such a manner so as to (a) comply with all applicable local, state, and federal laws and regulations and (b) protect the environment."

95. The 2002 Lease grants TVA the right to terminate the lease if the lessee "fails to comply with any of the provisions" of the lease.

96. On multiple occasions during the terms of the 2002 Lease, Sugar Camp Energy, the lessee, has failed to comply with the terms of the lease by violating water pollution laws and by failing to mine the coal reserves in a manner that protects the environment.

97. TVA has the right to terminate the lease at its discretion because Sugar Camp Energy has violated the provision in the 2002 Lease requiring Sugar Camp Energy to comply with all applicable laws and regulations. TVA thereby committed a legal error in asserting that the 2002 Lease requires it to authorize the mining expansion when TVA had the right to terminate the lease.

98. TVA's decision to authorize the mining expansion also is contrary to TVA's goals as stated by the agency. TVA's Environmental Policy states affirmatively that TVA is committed to "reducing environmental impacts," and "reducing carbon intensity and air emissions." The decision to expand mining directly undercuts this commitment as it will result in an "estimated 253 million tons of TVA-owned coal" mined and approximately 268 million metric tons of carbon dioxide equivalent emissions, according to the Final EIS.

99. Because TVA's decision to authorize the mining expansion was predicated upon legally erroneous constructions of the 2002 Lease, contradicts TVA's own expressed goals related to carbon emissions and statutory obligations related to environmental protection, and is otherwise unsupported by the agency record, TVA's decision was arbitrary and capricious in violation of the APA.

**Count II: Defendants Violated NEPA by Misstating the Nature of the Mine Expansion Authorization Decision.**

100. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

101. NEPA requires all federal agencies to prepare a detailed statement evaluating the environmental impacts of, and alternatives to, any proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

102. The decision to authorize the mine expansion was a major federal action that required TVA to prepare an environmental impact statement.

103. In preparing the environmental impact statement under NEPA, a federal agency must "study, develop, and describe technically and economically feasible alternatives." 42 U.S.C. § 4332(F).

104. In the Final EIS, Defendants stated that their primary purpose in selecting a preferred alternative was to "comply with the terms and conditions of the previously executed leases and agreements regarding the TVA Mineral Rights Area."

105. The Defendants misstated the decision to be made because they erroneously assumed that TVA was required to grant the mining authorization in order to adhere to the executed lease agreements. This assumption was based upon erroneous constructions of the 2002 Lease as described in Count I.

106. Defendants misunderstanding of the 2002 Lease was the basis for Defendant's choice of preferred alternative in the EIS and violates NEPA by rejecting an otherwise technically and economically feasible alternative without meaningful consideration or reasonable explanation, specifically the No-Action Alternative under which TVA would not have granted authorization for the mining expansion.

**Count III: Defendants Violated NEPA by Failing to Consider Reasonably Foreseeable
Environmental Impacts.**

107. Plaintiffs repeat and incorporate herein by reference each and every allegation contained
in the preceding paragraphs as if fully set forth herein.

108. In conducting environmental reviews under NEPA, federal agencies must evaluate and
provide "a detailed statement" on the "reasonably foreseeable environmental effects of the
proposed agency action." 42 U.S.C. § 4332(C).

109. In describing the environmental effects of authorizing the expanded mine operations,
Defendants assumed that Sugar Camp Energy would conduct expanded mining operations in
accordance with environmental laws and applicable permits.

110. Given the history of the Sugar Camp Mine operators consistently violating
environmental and safety laws and permits, set forth in paragraphs 29-47 above, which occurred
despite oversight by the Illinois Department of Natural Resources and other state and federal
agencies, this was not a reasonable assumption.

111. Because of Sugar Camp Energy's history of non-compliance, stretching back to when it
began operating in the TVA Mineral Rights Area, it is reasonably foreseeable that Sugar Camp
Energy will continue to violate environmental laws and the requirements of its permits moving
forward.

112. Defendants did not consider the environmental impacts of future violations of law in the
Final EIS.

113. Defendants violated NEPA because the Final EIS does not provide a "detailed
statement" of the "reasonably foreseeable" effects of Sugar Camp Energy continuing its practice
of operating in violation of environmental laws and applicable permits.

**Count IV: Defendants Violated NEPA Through an Incomplete and Irrational Environmental Review of Divestment of TVA's Southern Illinois Coal Reserves.**

114. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

115. The divestment of TVA coal, oil, and gas rights in Southern Illinois is a major federal action that triggers the environmental review requirements of NEPA.

116. In conducting environmental reviews under NEPA, federal agencies must evaluate and provide "a detailed statement" on the "reasonably foreseeable environmental effects of the proposed agency action." 42 U.S.C. § 4332(C).

117. TVA has purported to complete its NEPA review for the divestment decision through the issuance of its "Final" EIS, which explicitly considered alternatives related to divestment to "support and inform TVA's decision . . . [to] subsequently pursue divestment of the TVA Mineral Rights Area."

118. Nothing in the Final EIS suggests that additional NEPA steps will be taken before TVA's Board of Directors will "make[] a decision about divesting these mineral rights in the near term."

119. In the Final EIS, Defendants stated that "[t]he alternatives [considered in the EIS] are constrained by the terms of the executed lease agreement" and that the "Board['s] divestment decision will be in consideration of an existing, enforceable lease."

120. Accordingly, Defendants' NEPA review of alternatives related to divestment was improperly constrained by Defendants' erroneous interpretations of the Lease, as described above in Count I.

121. Defendants also erroneously interpreted the TVA Act as compelling selection of divestment as the preferred alternative.

122. TVA states that its preferred alternative includes divestment because Section 31 of the TVA Act "provides that real property interests shall not be held 'except when necessary in the opinion of the [TVA] Board to carry out plans and projects actually decided upon requiring the use.'"

123. TVA then suggests that it has no use or plans for the mineral rights given that it no longer purchases coal mined from the area and because it instead aspires to be net-zero by 2050.

124. The fact that TVA does not currently purchase coal from the Sugar Camp Mine does not mean that TVA has no use or plans for the mineral rights.

125. The Final EIS identifies TVA's 2019 IRP and 2025 draft IRP as containing the policies TVA asserts are advanced by divestment. Those integrated resource "plans" call for TVA to decarbonize in light of the environmental harms and liabilities created by greenhouse gas emissions from, among other things, burning coal.

126. Defendants' TVA Act obligation to hold real property only when necessary to implement TVA plans does not compel divestment, which is an assumption that limited Defendants consideration of alternatives in the Final EIS. Retention of the mineral rights—under a proper interpretation of the 2002 Lease—would allow TVA to discontinue future mining of the coal reserves. That would best advance the "plans" announced by TVA that call for decarbonization.

127. TVA failed to consider whether selling its coal reserves to another entity to be burned was consistent with its stated goals of decarbonization and protection of the environment. The sale of the coal to a private entity, in fact, contradicts the stated purposes of the action.

128. The Final EIS did not explain how the huge damage to the environment that would be caused by mining and burning the coal is in any way different or mitigated by the fact that

someone other than TVA would own the coal being mined and burned, or how selling the reserves to an entity that could mine the coal to be burned is consistent with TVA's stated stewardship goals, or why TVA's stated objectives to decarbonize and more broadly protect public resources are best served by divestment.

129. Even if TVA elected not to cease mining entirely, retention of mineral rights would allow TVA to maintain control over mining activities, ensuring that extraction, reclamation, and other operations are consistent with its existing plan to protect "TVA public land" and "manage it wisely for present and future generations."

130. Indeed, the EIS specifically notes that if it proceeds with divestment, "it will be incumbent on the future owner to determine how to administer that lease, which could include any action under the lease that is authorized and allowable." TVA noted this in the context of rejecting commenters' suggestion that it analyze an alternative in which all TVA-owned coal would remain unmined.

131. Defendants misunderstanding of the 2002 Lease, the Act, and TVA's own stated policy goals were the bases for Defendant's choice of preferred alternative in the EIS and violated NEPA because those legal errors caused Defendants to reject an otherwise technically and economically feasible alternative without meaningful consideration or reasonable explanation, including the No-Action Alternative, under which TVA would not divest its mineral rights, and the alternative of ceasing mining of TVA-owned coal, which was suggested by commenters but that Defendants did not assess in the Final EIS.

**PRAYER FOR RELIEF**

Therefore, Plaintiffs respectfully request that the Court:

1. Declare that Defendants' decision to authorize Sugar Camp Energy's mining expansion was arbitrary and capricious in violation of the Administrative Procedures Act.

2. Declare that Defendants violated the National Environmental Policy Act in the Final Environmental Impact Statement as to authorizing expanded mining by basing their consideration of alternatives on erroneous legal interpretations of the 2002 Lease and failing to consider the impacts of Sugar Camp Energy conducting future mining operations in violation of environmental laws and applicable permits in their decision to authorize Sugar Camp Energy's mining expansion.

3. Declare that Defendants violated the National Environmental Policy Act in the Final Environmental Impact Statement as to divesting TVA mineral rights by constraining their analysis of alternatives based on erroneous legal interpretations of the 2002 Lease and failing to explain how selling coal to another entity to be burned is consistent with TVA's stated goals of environmental stewardship and decarbonization.

4. Grant an order and a judgment vacating Defendant's decision to authorize Sugar Camp Energy's mining expansion.

5. Grant an order and a judgment enjoining Defendant from divesting TVA's mineral rights holdings in Southern Illinois based on the Final EIS.

6. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 18th day of December 2025.

/s/ Robert Weinstock_____

Robert Weinstock (IL Bar No. 6311441)
Northwestern Pritzker School of Law

Bluhm Legal Clinic
Environmental Advocacy Center
375 East Chicago Avenue
Chicago, IL 60611
Ph: (312) 503-1457
robert.weinstock@law.northwestern.edu
*Counsel for Prairie Rivers Network*


/s/ Albert Ettinger

Albert Ettinger (IL Bar No. 3125045)
7100 N. Greenview
Chicago, Illinois 60626
Ph: (773) 818-4825
ettinger.albert@gmail.com
*Counsel for Sierra Club*